Haden B. Hart v. Commissioner. Rhoda Hart v. Commissioner.
Hart v. Commissioner
Docket Nos. 16571, 16572, 19087, 19088. *
United States Tax Court
1950 Tax Ct. Memo LEXIS 175; 9 T.C.M. (CCH) 485; T.C.M. (RIA) 50146; June 14, 1950
*175 Arthur Glover, Esq., Amarillo Bldg., Amarillo, Tex., for the petitioners. Donald P. Chehock, Esq., and J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated for hearing and involve the following deficiencies in taxes: Haden B. Hart
Rhoda Hart
1943
1944
1943
1944
Income and victory tax
$26,567.12
$26,681.18
Income tax
$13,440.76
$13,965.21 The year 1942 is involved on account of the Current Tax Payment Act of 1943. The issues are: (1) The inclusion in community income of petitioners, income of H. B. Hart & Co.; (2) allowance in 1943 of a credit for a dependent child; (3) the disallowance in 1944 of the amount of $3,200 for interest; and (4) the allowance in 1944 of amounts for crop and lease rental, interest and compensation for services. The petitioners filed their returns on the community property basis with the collector for the second district of Texas. Findings of Fact The petitioners are husband and wife, residing in Gruver, Hansford County, Texas. Except for royalties, which are not in controversy, all of their income *176 for the taxable years was community income. For convenience, Haden B. Hart will be referred to as the petitioner. Petitioner's boyhood was spent on a ranch in Hansford County, Texas, helping his father operate a ranch. After some college training in animal husbandry and livestock training work and employment at Iowa State College, petitioner, in 1915, when he was 23 years of age, started to operate a farm on land leased by him. In 1919, after service in the army, petitioner raised cattle under a partnership arrangement with his father. The venture lost about $25,000 during the first two years. Most of petitioner's liability for the loss was paid in 1926 from a crop, for part of the seed for which about $150 was withdrawn from a bank account of Mary and Walter, two of his children. The petitioners had five children, who were born on the following dates: Mary Anna
May 14, 1920
Walter M.
June 22, 1921
Dorothy E.
July 16, 1922
Jack H.
October 30, 1923
Don B.
August 13, 1926
During the period from 1927 to 1930, petitioner operated a breeding cattle ranch on leased land in Hansford County, Texas, known as the Tyler ranch, located about thirteen miles south *177 of Gruver. In 1930 petitioners moved to a location about three and one-half miles south of Gruver, Texas, where they have lived at all times since. Petitioner continued the lease he had on the Tyler ranch. During the period from 1930 to 1934, inclusive, petitioner was farming from about 2,000 to 2,600 acres of farm land and had seven sections of grass land on which he was running a herd of good breeding cows, the number being around 300 in 1931. The financial success of petitioner's farm and ranch operations at that time was very doubtful, and he hired nothing other than transient help until the fall of 1934. Some of petitioner's children, without a great deal of supervision, did the majority of the work connected with the cattle and were beginning to plow and seed and repair fences. Petitioner never paid compensation to his children for services rendered to him. From December 1936 until September 1937, petitioner had a regular hired hand on the Tyler ranch on a salary and crop sharing basis and at times another hired hand. Petitioner's children performed services on the ranch a great deal of the time when they were not attending school. By 1937, Walter was able to perform the *178 same service as the regular hired hand. The work was done under the direction of, and considerable supervision by, petitioner. In 1935 petitioner's children became interested in club calf work, but petitioner persuaded them that a better plan would be for each to acquire five of his calves and raise them on a commercial basis. Thereafter in 1935 petitioner informed his children that each of them owned five calves in his herd, without, however, designating any specific calves in the group, and with the understanding that the stock would run on the land with petitioner's herd, and upon the sale of the whole herd, the proceeds, less death losses and other expenses, would be prorated among the owners according to their interests. The plan was continued until 1938 or 1939. The plan, known as the average method, was used frequently in Hansford County for running cattle in which employees of ranches and outsiders had an interest. This was the first plan the children had to earn something for themselves. In 1935 petitioner rented, for one-third of the wheat crop, a section of land owned by a grandfather of petitioner's children, known as the Hoke section, and entered into an arrangement *179 with his children by the terms of which they were to receive one-third of the wheat produced, for services to be rendered by them in connection with the farming of part of the land. Petitioner furnished equipment for the farming, furnished the seed, and paid all expenses in the growing of crops. The children performed some services in connection with the farming of the land. The arrangement continued until 1939. The proceeds of sale of calves and wheat produced under the ventures were kept in petitioner's bank account with the knowledge and consent of his children. By the year 1939 the total amount in the fund for the interests of the children was about $7,500, no part of which was ever paid directly to the children. In 1939 petitioner, with the consent of his children, agreed to advance to J. D. Amend one-half, or about $1,700, of the purchase price of about 90 head of cattle with the understanding that his children would pay the other half, and that upon sale the proceeds thereof, less a reasonable amount to Amend for pasturage, which was located about 20 miles west of Gruver, would be divided equally between Amend and the children. Jack and Walter rendered help to Amend in handling *180 the cattle. When Amend's pasture ran out, some of the children assisted in moving the cattle to the Tyler ranch. None of the children received compensation for services rendered in caring for the cattle. Upon the sale of the cattle about a year later, the profit payable to the children, amounting to about $2,300, was retained by petitioner for investment purposes, with the consent of the children. The petitioner, in the early thirties, first started to use custom workers, i.e., individuals who perform farming services under contract, for plowing and combining. By 1941 he was employing them for practically all of that kind of work on his farms. He did not employ any regular hired help after 1937, except on a few occasions, and then seldom had more than one hired hand. During the period from 1937 to 1940 the children did most of petitioner's cattle work and some of the farming, all of which work was done during summer months. The harvest period generally lasted about two weeks. During the taxable years custom workers did most of the plowing and seeding and all of the combining. Petitioner, Walter and Jack supervised the custom workers. The children attended high school in Gruver, *181 in which classes were dismissed normally at 4 o'clock, but Jack and Walter left at 2:15 p.m. In December 1939, petitioner leased from J. M. Shelton, et al., for a term of two years with an option of renewal for three years, at an annual rental of $5,000, about 10,000 acres of land in Hansford County located about 27 miles north of Gruver, of which about 3,750 acres were farming land and the remainder grass land. Before leasing the land petitioner had an understanding with his children, Don excepted, that each would rent from him one-half section of the farming land for 75 cents an acre, with the right in petitioner to receive all of any AAA allotments or parity payments paid on it, and the wheat pasture. The children were to farm the land leased to them and receive the net profits therefrom. Petitioner did not permit Don to participate in the Shelton deal because Don was too young and his past services did not merit as much consideration as the other children. Petitioner was to get rent in any event and expenses paid by him if no crop was harvested. Petitioner realized that he had everything to gain and little, if anything, to lose by the arrangement but "wanted them to get it the *182 hard way." When the venture was discussed petitioner decided that $3,000 of the $7,500 in his bank account representing earnings from the calf and Hoke ventures belonged to him and the children indicated that they desired him to retain the remainder thereof as a reserve for another crop in the event the current crop was a failure. The land was farmed by hired hands and custom workers. Walter did most of the supervisory work in raising the crops, with the help of Jack. At the same time, the children of petitioner rendered services to him in connection with his other farming and cattle business. The first crop on the land leased by the children was planted in 1940 and harvested in 1941. Petitioner paid all of the expenses in raising the crop and sold all of the wheat. He received in excess of $5,000 a year from AAA payments on the land. An amount for the net proceeds of the crop was paid to the children in 1941. Petitioner considered that the rent was paid out of the money which he owed the children. In 1941 when applying for AAA payments, petitioner informed the county board of an arrangement he had made with his children to farm the Shelton land and was advised by it that he could *183 retain the allotments unless the children made a protest. All allotment payments made during the taxable years on account of land on which the children had an interest in the crops were received and retained by petitioner. The ambition of petitioner's children was eventually to get into the ranching business, and petitioner's desire was to assist them achieve their ambition in that regard. In July 1941, when it appeared that the Shelton land would be sold by the owner, all of petitioner's children entered into an arrangement with petitioner for another venture on all of the land then owned and leased by him, excluding deals he had entered with others or would thereafter enter into with others, on other lands. The plan agreed upon was that petitioner would furnish the farming equipment, and have a right to all AAA payments and oil or gas rentals, that the children would perform services for him as they had been doing and plant the crops and render other services, in consideration of which the net profits from the farming operations would be divided, one-half to petitioner and the other one-half to the children. The children as a group had no cattle at that time but it was understood *184 that they would purchase not in excess of 250 head for which they were to have pasturage for that number of cattle, the remaining pasture to be retained by petitioner. Petitioner applied for and received and retained the AAA payments made on the land. At the time of making the arrangement with his children, petitioner expected to benefit therefrom by receiving the bulk of their services. He regarded it as the only "cinch venture that I ever had in my life." He thought, however, that it was better to be a little hard on them than to give them too much, for he wished them to earn what they made. During the summer of 1941 Walter informed C. A. Gibner, vice-president of the First State Bank, Spearman, Texas, that he and his brothers and sisters had formed a partnership with petitioner to conduct farming operations. Gibner suggested that H. B. Hart & Company be selected as a name for the enterprise and that name was given for the organization, which, only for convenience and without conclusion as to its nature, will be sometimes referred to hereinafter as the partnership. The children did supervisory work in connection with the planting of wheat during the summer of 1941 for the account *185 of the partnership and did part of the actual work. It is not unusual in Hansford County, Texas, for a father to enter into an arrangement with his children to farm and raise cattle on a profit-sharing basis. On December 31, 1941, petitioner deposited the amount of $2,492.59 in the bank account of each of his children, except Don. New accounts were opened on that date for Mary and Dorothy. The amount deposited was for net profits from the wheat crop harvested on the Shelton land in 1941. The partnership filed a return for 1941 showing gross receipts of $12,070.36 from business, without otherwise specifying the source, the amount of $2,100 as cost of labor and supplies, including rent of $600, and no other deductions. Inventories were not used to compute gross profit from business. Petitioner's children, excluding Don, were listed in the return as the partners and each entitled to one-fourth of the net income, or $2,492.59. The distributable net income was reported in returns filed for 1941 by C. A. Gibner, as attorney-in-fact for each of the four children. The tax shown in the return filed for Jack was paid by a check charged to his personal bank account on March 25, 1942. In *186 March 1942 Jack, Walter and Dorothy gave Gibner a power of attorney authorizing him, among other things, to sign checks and notes, make deposits in their account at the bank, and sign income tax returns for them. Like power was given to him in April 1943 by Don. The return of petitioner for 1941 does not include any amount for rent other than from oil leases. Prior to or in 1941 petitioner rented 120 acres of his home land to Don for one-third of the crop, Don to take the remainder. The proceeds of the 120 acre wheat crop in 1941 were retained by the petitioner and charged to Don "for going into the company" (partnership). At the same time, Don had a cattle deal with J. M. Shelton under the terms of which he was to have a one-third interest in them for pasturage and care. On December 31, 1941, a bank account was opened for Don with a deposit of $2,160.50. Don filed a return for 1941 in which he reported net income of $1,001.80, consisting of receipts of $2,160 from cattle, less cost of $1,158.20. In the fall of 1941 petitioner purchased a total of 1,000 head of cattle for $38 a head, and, in accordance with the arrangement made at the time the partnership was formed, each of petitioner's *187 children purchased 50 cattle for $40 a head, with the understanding that they would run with the entire herd on an average basis. The children paid for the cattle on January 3, 1942, by checks drawn on their personal accounts. No separate brand was placed on the cattle purchased by the children. At about the same time Jack and Walter "cut" 90 head out of the herd, on which, and 60 other cattle they then owned jointly independent of the partnership, they placed their own separate brand. The checking accounts of Jack and Walter were each credited in 1942 with a total of $5,605.30 as the proceeds of a sale for $11,510.60 of 90 head of cattle out of the herd of 150 which they owned individually. The difference of $300 between the credits and selling price is not explained. Petitioner in 1935 started to discontinue his cattle breeding business, and by 1942 he had nothing but stocker cattle, which require less care and feed than breeding stock. During the fall and winter the cattle grazed on wheat pasturage as long as it existed and were then run on grass pasturage if it was available. After the harvest in 1942, the children purchased from petitioner, for $20,000, or $80 a head, a *188 250 head interest out of the herd of 1,000 petitioner acquired in the fall of 1941. The children as a group did not prior to or during the taxable years have a separate brand for cattle. Petitioner's brand was placed on all cattle. At the time of the sale to the children in 1942, petitioner had some other cattle on hand in which the children did not acquire an interest. Petitioner's separate cattle were sold in February 1943 for $14,995.40. The proceeds of the sale were erroneously credited to the partnership. In September 1942, Jack and Don each purchased from J. M. Shelton for $5,652.50, and Walter for $5,613.13, about one section of grazing land in the same block in Hansford County. Petitioner paid the consideration for the land. Jack and Don gave their father notes for the land deeded to them. Jack paid his note after his discharge from the Army in 1945. Petitioner never entered into a written agreement with his children to cover any of his business dealings with them. Petitioner had no books prior to 1940, when a set was opened for him by C. A. Gibner, vice-president of the First State Bank, Spearman, Texas, of which petitioner was a stockholder, and had been a director *189 since 1930, and where he had had his checking account since 1935. All of the proceeds received prior to December 12, 1942, from sales of wheat and cattle for the account of petitioner and the partnership, were deposited in the account of petitioner, and all expenses were paid therefrom. Petitioner offered to turn the children's part over to them and told them that any time they wanted it they could draw it out of the bank. They asked him to keep it in his account and have it there for investment for them. In about the spring of 1942, after income tax returns for 1941 were filed, petitioner requested Gibner to open books for the partnership. Later in the year, D. D. Moore, cashier of the bank, was requested to prepare working sheets showing the interest of petitioner and the partnership in the former's bank account from wheat operations, and was informed that the children would purchase an interest in the cattle at a later date. In December 1942, Moore was requested to open a set of books for the partnership and was informed by petitioner that the children had a one-half interest in the operations of petitioner, including cattle. The procedure to be followed in opening the books was *190 left to Moore, whose understanding was that petitioner and the partnership had a one-half interest each in wheat sales, and after September 1942 in cattle on petitioner's property, and that expenses were to be shared equally, unless otherwise informed by petitioner. On December 12, 1942, Moore opened a bank account in the name of the partnership in the First State Bank, also books therefor as of January 1, 1942. Deposit slips and canceled checks of petitioner's bank account were used by Moore to prepare working sheets for the income and expenses of petitioner and the partnership. Entries were made in the books from the working papers, the entries for the partnership having been made in the books containing the accounts of petitioner. The details were not supervised by petitioner, but he was consulted by Moore when he was in doubt about an item of income or expense. The stamp "H. B. Hart & Company" was inserted over the signature of petitioner on checks issued by petitioner for expenses allocated to the accounts. Checks were drawn on the account of the partnership, some of which were antedated, to show purchases and payment of expenses to reimburse petitioner. Among the checks issued *191 by Moore against the partnership's bank account in favor of and signed by petitioner was one for $20,000 to record payment for 250 head of cattle purchased in September 1942, and one for $1,225, in favor of petitioner, at his request, to reimburse him for extra expense for hay and other feed for the 250 head of cattle the partnership purchased from him in 1941, also expenses for care the partnership did not give the stock due, in part, to the fact that Walter was in the military service. The amount was included in petitioner's return for 1942 as compensation for personal services. The checking account opened for the partnership was credited with $11,642.25 for the sale of 90 out of a lot of 150 head of cattle sold for $19,403.85, and the remainder of $7,761.60 for 60 head to the checking accounts of Jack and Walter, one-half to each, with $8,346 on account of the sale of 65 cattle and $6,161.70 for another cattle sale of an undisclosed number. The deposits for the sale of 150 cattle were made by petitioner. All of the sales were of cattle out of the herd of 1,000 head. One-half of the first two credits, a total of $19,988.25, should have been credited to petitioner. Petitioner's check *192 was received for the last sale in the amount of $6,161.70. In addition thereto the books of the partnership were credited with $11,510.60 for sales of cattle which were owned individually by Jack and Walter, thus increasing cattle sales by the partnership in 1942, according to its books, to $37,660.55. No signature cards were ever obtained by the bank for drawing checks against the partnership account. The bank permitted withdrawals from accounts without signature cards whenever it believed payment would be approved by the depositor. Moore was paid about $400 a year for keeping the books of petitioner and the partnership. The books of petitioner and the partnernership for 1943 and 1944 were kept by Moore. Petitioner paid most of the expenses out of his personal account. Moore made entries periodically from bank statements and wrote checks on the partnership account to reimburse petitioner for partnership expenses petitioner had paid out of his account. The children never participated in determining the income and expenses of the partnership from sales made and expenses paid by petitioner. Almost all of the checks drawn on the partnership account to reimburse petitioner were signed *193 by Moore. Income and expenses were divided equally, at petitioner's request, unless instructions were received to the contrary. Excluding the credit made in February 1943 for $14,995.40, for every credit to the partnership for sales of cattle, a corresponding credit was made in the account of petitioner. In August 1944 the account of the partnership was credited with a total of $7,500 borrowed from petitioner. In November 1944 the loan was paid without interest by a check drawn on the partnership account by Moore. Petitioner never charged interest on money advanced to his children or the partnership. In 1943 and 1944 the following total amounts were withdrawn from the partnership bank account by checks signed by Moore or petitioner for deposit in the personal checking accounts of the children: Dorothy and Don each $8,800, Mary $7,800, Jack $6,800, and Walter $8,000. Deposits at the bank of proceeds of sale of wheat and cattle were usually made by the petitioner. At times checks were received directly by the bank or deposited by a member of petitioner's family. Most of Moore's dealings were with petitioner. In addition to Moore, Gibner and tellers at the bank accepted deposits. *194 Deposit slips were, with possibly a few exceptions, made out by the individual who took the deposit. In the absence of instructions from the person making the deposit, Moore, Gibner, and the tellers assumed that a deposit of proceeds of the sale of cattle constituted partnership cattle and generally, in the absence of instructions otherwise, divided such deposits equally. Moore could not recall an instance when petitioner told him that the deposit for cattle sales, except when made for other persons, was not to be divided. During 1943, 34 checks and six drafts, totaling $113,729.82, were written on or charged to the bank account of the partnership. Twenty of the checks were signed by Moore and 14 by petitioner. The checks signed by Moore were for deposits in the personal accounts of the children, and to make adjustments between petitioner and the partnership for expenses and cattle purchases. Other than for withdrawals by the children, the checks signed by petitioner were for school district taxes, and other unidentified taxes in the amount of $74.10, charges for preparing 1942 tax returns, bonds in the amount of $10,000.72, and reimbursement for cattle purchased by him. During 1944, 47 checks *195 and four charge slips, totaling $178,486.84, were drawn on and charged to the partnership bank account, of which 28 checks were signed by Moore for the same reason as in 1943, 15 checks were signed by petitioner, three by Gibner, and one by Dorothy, for $5.40. One of the checks signed by petitioner was in the amount of $3,000 for a charge he made against the partnership because of a reduction in his AAA payments and in order to enable him to recover all of his farming expense, including the preparation and seeding of wheat land. Other checks signed by him were in payment of tax notes and bonds, amount $4,375, school taxes, grass rent, plowing and seeding, and for withdrawals of the children. The checks signed by Gibner were for payments on an insurance loan, the one by Dorothy being also for that purpose, and in payment of a charge for preparing 1943 tax returns. One of the charges was $20,000 for one-half of a loan made to P. F. Hawkins on his note. The loan was made by petitioner, who advised Dorothy and Don that it had been made. The loan was paid in November 1944. Other than the check for $5.40, signed by Dorothy in 1944, none of the children ever signed a check on the partnership *196 bank account. Only a few of the checks drawn in 1943 and 1944 were payable directly to outside creditors. In August 1943 the partnership purchased, for $41,202.75, of which $32,739.35 was payable in cash, three and one-quarter sections of land in Sherman County, Texas. The cash consideration was paid by the partnership on August 13, 1943. The partnership received rental in 1944 from the crop and began to farm the land in 1945. Petitioner had no interest in the crops produced on the land. During the taxable years petitioner and the partnership operated in their enterprise about twelve sections of grass land, practically all of which was rented, and about ten and one-half sections of farming land, four of which were rented. Some of the land was about 30 miles distant from other parts thereof. The chief factors in successful stock farming around Gruver are sufficient rain to grow wheat, and purchasing cattle at low prices and selling them on a high market. If there is wheat pasture during winter months, cattle operators are generally prosperous. Petitioner had unusual ability in buying and selling cattle and in stock farming, i.e., raising wheat and cattle. He frequently bought *197 and sold cattle for others. Petitioner, during the taxable years, spent most of his time during the day at a hardware store or the Gruver Coffee Shop in Gruver. His services at that time, in connection with the affairs of the partnership, consisted primarily of buying and selling of all cattle, giving assistance for short periods a few times in cutting cattle out of a herd, and to get cattle ready to ship, hiring custom workers, and, on a small number of occasions, inspecting their work, doing the banking business, and paying expenses. All of the farming and cattle business of petitioner and the partnership was done under the general management and supervision of petitioner. He never did any of the physical work of farming, including the operation of a tractor. The children sought his advice on ranching and farming problems, and Don and Dorothy usually conferred with him before they moved cattle from one pasture to another. Petitioner at times discussed with, and received the opinion of, one or more of the children before he purchased cattle or sold wheat and cattle. However, he sold wheat and cattle of the partnership the same way he sold his own. While they were at home petitioner *198 depended upon the children to hire help for cattle work, when it was needed. Until 1941 petitioner never had income in excess of $14,000 a year. Mary performed services on the ranch while she was maturing and performed a great deal of domestic services for her mother. She graduated from high school in 1938 and for four years thereafter attended Iowa State College, in Ames, Iowa. She spent the usual college vacation periods and summers at home. Upon her graduation in June 1942, she was married to Anton Johnson, a rancher, and moved to Montana, where she has since resided. She has four children, born in 1943, 1944, 1945 and 1948. Upon her marriage, the other children, at petitioner's suggestion, considered the question of whether to continue her interest in the partnership or pay her interest to her, and decided to continue with her as a partner. Mary and her husband did not visit the Hart ranch after their marriage until the fall of 1944. She did not perform any farm or ranch work during the visit, but her husband helped build fences and cut cattle. Walter completed high school in 1938, and entered Iowa State College with Mary in the fall of that year. After two years at that institution, *199 he transferred to Texas A. & M., located about 575 miles from Gruver, from which he was graduated in May 1942. Except for six weeks in the summer of 1941, he was at home during vacation periods and each summer while in college. He came home several times during the fall of 1941, when his father was sick in a hospital, to work cattle over week-ends. Immediately upon graduation, he entered the military service, in which he remained until he was killed in action in May 1945. While on duty in the United States, he was home on furlough for a few days in September 1942, and March 1943, when his wife was sick in a hospital in Amarillo. He went overseas in June 1943 and did not thereafter visit his home. While home on furlough Walter did some work caring for cattle. Walter left surviving him a wife, whom he had married in March 1942. Walter's former interest in the partnership was discontinued as of July 31, 1945, at the widow's request. At that time title to a section of land in Sherman County was in Walter's name, which was subsequently purchased by Dorothy. At the time of his death, Walter was indebted to petitioner for a payment petitioner had made on the purchase price of the land. *200 Later, the debt to petitioner was satisfied by an adjustment of indebtedness of petitioner to the partnership and sums due the widow from the partnership on account of Walter's former interest. The books of the partnership disclose that a total of $20,112.43 was paid to the widow in 1946, and $2,000 in 1947. The widow retained a one-fifth interest in the land the partnership acquired in Sherman County in 1943. Not many cattle were on hand at that time. At the time of the hearing herein no final settlement had been made with the widow. Walter's estate was never administered in court. Dorothy finished high school in 1939 and attended Iowa State College for four years commencing in the fall of that year. She was at home each summer and during Christmas and spring vacation periods. She taught school full time five days a week in Borger, situated about 20 miles from the home ranch, from the fall of 1943 until the end of the school year in May 1944. She visited her home practically every week-end in the fall of 1943, and thereafter until late February generally remained in Borger on week-ends. The cattle were sold after a blizzard in December 1943, and there was no cattle work for her *201 to do at home. Thereafter, she came home occasionally for weekends. Dorothy taught school at Gruver commencing in the fall of 1944. Cattle were being delivered at that time and, therefore, it was unnecessary for her to miss more than a few days from her teaching work in order to perform duties on the ranch. While home from college and not teaching school, during the taxable years Dorothy rendered assistance at times in the cutting, weighing and driving cattle to a shipping point, which was generally Gruver, and moving cattle from one field to another, and checked cattle in the fields, did some supervisory work in plowing and in planting and harvesting wheat, maintained records of grain stored in the elevator in which petitioner had an interest and supervised help at the grain elevator. She never built or repaired fences or did tractor work. Jack completed high school in 1940 and in the fall of that year he entered Iowa State College, majoring in animal husbandry. He left college in the spring of 1943, and entered the Army after two or three weeks at home. He was at home during the Christmas and spring vacation periods, and the summers of 1941 and 1942. Jack was home on furlough for *202 about three weeks in December 1944 and January 1945, and for about ten days in May 1945. He was not home again until after his discharge from the Army in April 1946. During the summer of 1942 Jack made repairs to sheds for the storage of barley, cared for cattle, including stock on the Tyler and the Shelton ranches, assisted in the harvesting and storing of the barley crops, and plowing. While home on furlough Jack performed duties in caring for cattle. After his discharge from the Army, Jack entered into a partnership with Don, and into another one with Don and Dorothy to engage in the cattle and farming business. Most of the capital required for the ventures was derived from the partnership. Don supervised activities on the Hart ranch during the fall of 1941 after the other children returned to college. He completed high school in 1943 at Gruver. Don's hours at the Gruver High School were from 9:30 a.m. to 2:30 p.m. He remained at home until the cattle were sold in January 1944, when he entered Oklahoma A. & M. Stillwater, Oklahoma, located about 310 miles from Gruver. He came home for short visits two or three times during the remainder of that school year and did not return to *203 college until the fall of 1945. While he was at Oklahoma A. & M. in 1944 there were no cattle on the Hart ranch and no farm work to be done. During the taxable years, Don, while at home, rendered supervisory services in the plowing of land and planting and harvesting of wheat, made repairs to fences and other property, and performed duties necessary on the ranches to care for cattle. The petitioners planned to send their children to college if they desired to go and to pay their expenses if they were financially able to do so. Most of their college expenses were paid by the petitioners. The petitioners listed the following cattle as subject to taxation on January 1 of the years 1942, 1943 and 1944, in Hansford County: 1942
25 cows
700 calves
1943
160 cows
100 calves
1944
15 cows
232 yearlings For the years 1943 and 1944 petitioners rendered for assessment against the partnership, inventories showing 160 cows and 100 calves on hand January 1, 1943, and 15 cows on hand January 1, 1944. No personal property assessments were made against the partnership for 1942. The partnership filed returns for 1942, 1943 and 1944, showing income from sales of cattle *204 and grain, and net income of $53,394.23, $56,550.20 and $50,981.08, respectively, distributable in equal amounts to petitioner's five children. The shares so reported were included in returns filed by the individuals. All of the returns were signed by C. A. Gibner, as attorney-in-fact, except the partnership return for 1944, which was signed by petitioner and the returns of Dorothy and Don for 1944, which were signed by them personally. The partnership return for 1942 reported cattle sales in the amount of $37,660.55 without figures for an inventory at the beginning and close of the year. The partnership return for 1943 reported cattle sales in the amount of $119,941.19, an opening cattle inventory of $36,387.86 and a closing inventory of $12,183.40, no part of which represented cost of an interest in the herd of 1,000 cattle petitioner purchased in the fall of 1941. The amount of $12,183.40 was used as the opening inventory in the return for 1944, for which year it reported cattle sales in the amount of $74,005.15. The petitioner reported a closing cattle inventory in 1943 and an opening inventory in 1944, both in the amount of $12,183.39. He also reported cattle sales of $244,298.51 *205 in 1943 and $139,684.91 in 1944. Petitioner and the partnership each reported a closing inventory of $32,519.57 in 1944. The petitioner deducted in his return for 1942 the amount of $9,110.20, for "farm rents and pasture," and the partnership nothing for such an item. The petitioner deducted in his return for 1943 the amount of $819.05 for "rents and leases"; and the partnership nothing for such an item. "Feed and pasture" appears as a separate item in each year in each return. For 1944 petitioner deducts $4,908 for "rents and leases" and the partnership nothing for such item. For 1944 the partnership deducted $20,006.57 for "plowing, drilling and combining"; and petitioner nothing for such an item. The respondent adjusted community gross income for 1942 by including therein $10,000 for sale of cattle to the partnership. In the years 1942 and 1943 respondent allowed petitioner a credit for one dependent. In determining the deficiencies for 1944 respondent allowed as a deduction the following amounts as expenses for payments to his children: One-fourth crop rental
$10,420.35
Lease rental
525.00
Interest
202.78
Compensation for services of Don
2,000.00
*206 In each taxable year, respondent included in community income of petitioners the net income reported by the partnership. The petitioner in 1930 purchased a section of land from L. A. Laird for $40 an acre. The purchaser paid about one-third of the selling price as an initial payment and agreed to pay interest at the rate of 6 per centum per annum on the unpaid balance. In about 1935, at the request of Laird, petitioner applied for a Federal Land Bank loan, and one was approved for $10,000. Laird was disappointed in the amount but accepted it in satisfaction of the debt, evidenced by a note, and gave petitioner a release, previous to which he informed petitioner verbally that he thought petitioner should pay the back interest "if conditions ever get to where this place makes any money," to which petitioner replied that he would "if the place ever made any money and got to where I could." The remarks in regard to payment of interest were not reduced to writing. In July 1944 petitioner paid $3,200 to Laird as interest on the note released in 1935. In his determination of the deficiencies for 1944, the respondent disallowed the deduction claimed for the payment because of failure of *207 proof that the amount was for interest due Laird. The petitioners and their children in good faith in 1941 entered into a partnership, effective in the taxable years, for a business purpose of farming, intending thereby to join together in the present conduct of such business. Opinion Our primary inquiry here involves a family and an alleged partnership. (We use the word "partnership" hereafter for convenience, in general, in the discussion). The record, and the answer to the problem posed, has given us great difficulty. The evidence contains many inconsistencies. The voluminous evidence contains much that has little or no bearing upon the essential question presented for solution. We have analyzed the record in detail and with care in an attempt to get the truth from a situation appearing none too clearly in many particulars. The question presented is one of fact, in the determination of which we must consider the "agreement considered as a whole, and by their conduct in execution of its provisions." . The facts have been found and set forth in extenso above, and need not be repeated here. The respondent urges that petitioner *208 was properly taxed under "the first principle of income taxation; that income must be taxed to him who earns it" as expressed in the Culbertson case. See also . The petitioner in the petitions and at the trial and upon brief took the view that he had a joint venture, during the taxable years, with his five children who had among themselves a partnership, and that the income of their partnership was not taxable to him. Upon reply brief there appears to be a change of position, for in response to respondent's argument in effect that the services of petitioner, and particularly the many checks written by him on the partnership account, indicated that the business was in fact his own, the petitioner argues "Haden B. Hart was a member of the partnership in controversy. It was not unnatural for him to perform some service in respect to its business" - but that those services were not alone responsible for the production of the income of the partnership. He closes on the point by submitting that "the members of H. B. Hart & Company properly reported fifty per *209 cent of the net income of the partnership existing between Haden B. Hart and H. B. Hart & Company." These statements seem to indicate agreement with the respondent's view that "we have here for consideration a family partnership case, regardless of the terminology used * * *." After much study we have concluded that there are in fact two different situations, requiring separate consideration, one as to wheat farming, and the other as to the cattle business. We will first consider the wheat farming. As to it, there is evidence of partnership. Under , we are to decide as fact upon the intent involved - "whether the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." We find the evidence difficult to reconcile, with much to sustain the argument of both parties. Though the Culbertson case lays down the rule as to intent, and against objective tests, it also says that "If it is conceded that some of the partners contributed neither capital nor services to the partnership during *210 the tax years in question * * * it can hardly be contended that they are in any way responsible for the production of income during those years." In this connection the petitioner, apparently to demonstrate contribution of capital by the children, places considerable emphasis upon earnings by the children in earlier years, from their "calf" enterprise, Hoke section farming, the Amend cattle venture, and the Shelton farming in 1940-1941, and Don's separate Shelton cattle deal; also Don's 120 acre wheat crop in 1941. Examination of the record discloses that this is almost though not wholly without basis. The petitioner kept for himself $3,000 of the earlier earnings ascribed to the children, and for no reasons suggested charged Don his earnings on the 120 acres "for going into the company." The remainder of the "calf" and Hoke profits was retained by the petitioner as a reserve for another crop in the future. With the exception that the petitioner testified that he considered that the rent on the Shelton crop harvested in 1941 was paid out of the money he owed the children (he did not return the amount as income) we can find none of the previous earnings ascribed to the children (but *211 in possession of the petitioner) invested either in farming or cattle; except that Don put $2,000 of the $2,160, earned by him in 1941 on his Shelton cattle, into the $10,000 paid for 250 head of cattle in January 1942. The four other children gave their checks for those cattle from their earnings in the Shelton farming deal of 1941. The $20,000 cattle project, about September 1942, was by way of a charge by petitioner against the proceeds of the wheat crop in 1942. As to the farming project initiated in July 1941 and apparently continued through the taxable years, we have a case involving an oral understanding without written agreement, with no partnership capital accounts, and in fact no accounts, set up, except bank accounts set up in December 1942 and made purportedly retroactive to early in that year. No evidence appears as to notice given to the public in general, by publication or otherwise. The petitioner did, however, render property for assessment as belonging to the partnership. Nothing in the oral understanding indicates agreement to share losses; and most of the children were minors. To this is added that the amounts of partnership profits withdrawn in the names of the *212 children are small in comparison with the earnings. The respondent, in effect, urges these indications of no partnership, also that though the partnership is reported as beginning in January 1940, the petitioner kept all moneys (except the $10,000 paid for cattle) under his own control and in his account until December 1942, a period of almost three years, and that he paid all expense. Such facts, and petitioner's later decision to charge the children $3,000 because his AAA payments were less than anticipated and charge to them of $1,225 for care of cattle, are, the respondent in substance contends, indicia of "passive acquiescence" on the part of the children to petitioner's will and control. The $1,225 indicates also his services, for the check is marked "for expense of looking after and caring for cattle," and petitioner returned that item as a part of "salaries and other compensation for personal services." The respondent further contends, in substance, and the evidence in fact shows that the petitioner employed the custom labor which in large measure did the farming; that he continued even after the partnership account was set up in December 1942 to issue checks on the partnership *213 account throughout the taxable year, and that in fact the only check written by any of the children was one for $5.40 by Dorothy; that he lent one Hawkins $20,000 of the partnership funds (though Don and Dorothy were later advised); that he purchased $14,375 worth of Government securities by partnership checks; that no general notice of partnership was given to the public; that Walter, Mary and Jack performed practically no services during the taxable years, Dorothy only when not in college or teaching, and Don only when not in high school or college; that expenses were not split between petitioner and partnership according to petitioner's theory, for in 1944 about $20,000 was deducted by the partnership for "plowing, drilling and combining," whereas petitioner claims no such deduction; that though, as the petitioner's brief emphasizes, the partnership was to pay one-half of lease rentals, they were all paid by the petitioner; and that large items, such as a cattle sale of $14,995.40, were not recorded in the petitioner's and partnership's bank accounts in accordance with facts or petitioner's theory. We have considered all of these facts, and very many more not here enumerated though *214 discussed in the briefs of the parties and studied by us. There is clearly much in the record affording basis for the Commissioner's contention of no good faith agreement of partnership and inconsistent with such theory. Nevertheless, upon all of the facts, and without making any objective test, we have come to the conclusion that the parties, in good faith, entered into an agreement to join together in the present conduct of a wheat farming enterprise when, after the Shelton harvest in 1941, they agreed as to the farming of petitioner's lands. As above suggested, the cattle were purchased later, are not here being included, and will later be discussed. There was an actual agreement as to farming and division of labor thereon and of profits therefrom, and under the evidence the parties acted under such agreement. After December 1942 such division was indicated on bank records made. It is not suggested that the agreement did not continue in effect through the taxable years. The children, though contributing, as above seen, little of capital to farming, did, though we think not in the amounts asserted, contribute some farm work. Though the farming was largely custom labor, it required *215 on the spot supervision, and this the petitioner did not, in general, furnish. Though some of the children contributed very little or nothing in the taxable years, some of them furnished, on the evidence, practically the only direct supervision that was given to the actual farming, as distinguished from the more general supervision by the petitioner from the town where he stayed. Under , since the contractual arrangement was made in 1941, the fact that Walter and Jack were in the military service in the taxable years should not cause them to lose the status of partners; and though Mary Anna does not come within the same category, her absence in Montana and lack of services was, under the evidence, a matter of agreement between the children, to the effect that she should remain in the partnership. Under all of the facts, not confined to but including the oral agreement under which farming would be conducted, the training of the children, involving education in agricultural colleges for ranch life, their interest therein as evidenced by their activities on the ranch and their remaining in that vocation in later years, and the interest of *216 the parents in raising them to lead a ranching life and their participation in the earning of the profits in the taxable years and to some extent earlier, indicates that there was in fact, despite many indications contra, good faith agreement of partnership in wheat farming entered into in 1941 and carried through the taxable years. Though the mere receipt by the children of proceeds of the agreement does not prove partnership, since it could be mere distribution of results of petitioner's labor, under the agreement they had rights in such proceeds, and we find significance in the fact that other ranch lands were purchased by some of the children with the proceeds here involved. Though the petitioner kept the bank account under his control, at first in his name, up to December 1942, yet the testimony is that he offered to turn the children's part over to them but they wanted him to keep it. Though bookkeeping methods and finances in general were loosely handled so far as showing the partnership status, under the testimony this appears to have been mutually satisfactory, and appears in keeping with the family relationship and understanding. No objection by the children at any time *217 appears. Therefore, upon all of the evidence, and not without doubt, we conclude and hold that within the language used in the Culbertson case the petitioners and their children did in good faith enter into a partnership agreement, for the business purpose of wheat farming, intending thereby to join together in the present conduct of such business, and that the Commissioner erred in including the income of H. B. Hart & Company in that of the petitioners. This disposes of the deduction for dependency of a child and the allowances made by the Commissioner for rentals, interest, and Don's compensation, on the theory of no partnership. We pass now to examination of the situation as to the cattle business, for we find the record in that respect by no means the same as that of the wheat farming. In short, we find under the evidence no agreement of partnership in cattle raising. The petitioner on brief, page 68, recognizes that the partnership agreement did not cover cattle until after the harvest of 1942, for after referring to the 1942 crop and the $20,000 purchase, then to agreement about the partnership purchasing half of future cattle, and division [of] expenses and profits, it *218 is recited: "The terms of the original partnership were thus enlarged to include * * *." But we are wholly unable to find any testimony or other evidence that the original partnership agreement was so "enlarged." Under all the testimony, the children merely, at that time, purchased another 250 head interest. Despite the above statement on brief, petitioner's request for findings of fact recites only that after the $20,000 purchase the "joint venture" continued "with the further understanding that Haden B. Hart and H. B. Hart & Company would share equally in cattle thereafter purchased and brought home * * *." The evidence cited merely shows the purchase of cattle as above seen. When in July 1941 the partnership agreement as to wheat farming was entered into there was agreement that the children, who as a whole had no cattle at that time, would purchase not more than 250 head. For these they were to have pasturage, but all remaining pasture was to be retained by the petitioner. Thus, it appears that at that time, July 1941, there was no agreement of equal participation in the cattle business. The children merely became, about January 3, 1942, for $10,000, co-owners with the petitioner *219 in an alleged 1,000 head herd of cattle on the home ranch, to the extent of a 250 head interest, with right of pasture for that number. The next cattle purchase by the five children mentioned in the testimony is the $20,000 purchase of an additional 250 head interest, on September 20, 1942, this making a half interest in the 1,000 head herd purchased in 1941 by the petitioner. The record shows no agreement at that time, or any other time, between petitioner and the children as to pasturage, from the farming operations, for these or any other cattle (except, as above, the previous agreement as to pasturage for the first 250 head interest). It is true that the petitioner testified that after September 1942 and through 1944 the children had a half interest in all cattle "brought home," and that Moore, the bank employee looking after the records, said that cattle brought home and run on the Hart properties were "partnership fifty-fifty," though later he merely says "fifty-fifty." But under the evidence Moore's information came from others, particularly petitioner, was limited, so far as the evidence shows, to 1942, and his erroneous impressions are evidenced by his statement that he *220 did not think petitioner had any other separate cattle of his own - which is directly contradicted by petitioner's own income tax returns. Moore was not told of cattle operations until December 1942, though he knew of the wheat operations before the middle of the year. We also have the conclusion expressed by Jack that the acquisition of the cattle in September 1942 made a "partnership" out of the deal; but his testimony is, elsewhere, as follows: "No, we didn't own a half interest in all his cattle, but as a general rule - or, I'd say practically all the time any cattle he brought into Gruver we were given - bought a half interest in them. * * *" This, of course, proves purchase of cattle, and suggests no partnership. On the contrary, it indicates that there was none - only co-ownership. There is nothing in the record before us to show a partnership agreement as to cattle. The alleged equal division by Moore on the bank records as to cattle is not only disproved by what he did in several important matters but, in any event, indicates nothing more than co-ownership in the $10,000 and $20,000 purchases. Circumstances and facts such as have impressed us to conclude there was wheat *221 farming partnership, are distinctly absent when we consider the cattle. Had there been a cattle partnership from and after July 1941 it would appear remarkable that the petitioner would, as he did, report in his cattle inventory with his income tax return for 1942, the fact of thirteen cattle purchases from January 29, 1942, to September 18, 1942, without the children or partnership appearing in any of them. It is, of course, possible that all of these cattle were not "brought home," but does not seem probable, and we have no evidence on the point. Moreover, the $20,000 purchase on September 20, 1942, in which the children figure, is followed by acquisition of a half interest in cattle costing about $44,139.12 for $22,069.56, from September 20, 1942, to December 31, 1942, as shown by notation on the check bearing the latter date. We have no testimony or other evidence on such purchase or purchases, therefore know nothing as to partnership arrangement, pasturage or other connection with the farming enterprise. The same is true of all later cattle purchases, as to which the evidence is only that there was a division on the records kept by Moore and that the cattle inventories of petitioner *222 and the partnership were identical at the end of 1943 and of 1944. The record also shows, however, that petitioner sold cattle to the extent of about $244,000 in 1943 as against about $119,000 sold by the partnership, and that in 1944 he sold about $140,000 as against about $74,000 for the partnership. Since Moore, in effect, took his directions from the petitioner and divided the figures, except when otherwise directed, it is obvious that any division by him is no plausible proof as to whether the figures actually represented cattle transactions on the home ranch, to which the "partnership" cattle transactions are under the evidence limited. Such division could have represented transactions on cattle not "brought home," and in which petitioner only was interested. The absence of an agreement as to cattle as alleged by petitioner is otherwise in part shown by an analysis of cattle transactions in 1942 and the closing inventory of the alleged partnership for that year. Jack and Walter owned 60 head of cattle in the fall of 1941 on which they had their own separate brand. The herd was increased to 150 head by removing at that time 90 head from the 1,000 head petitioner purchased a *223 short time previously. Jack testified that he "cut 90 head off of his [petitioner's] 1,000 head." No proof was made that Jack and Walter ever paid for the 90 head they obtained in that manner from petitioner. Jack and Walter received credit in 1942 for sales in 1942 for $11,510.60 of 90 head of the herd. The sales, although the proceeds thereof were actually received by them, were not returned by Jack and Walter but were entered on the books of, and returned by the partnership, even though the proceeds of the sales were not credited to the bank account opened for the partnership. The record contains no explanation as to what happened to the remaining 60 head. We thus find that Jack and Walter each received credit for the proceeds of sale of 30 head of cattle, which, according to petitioner's theory, belonged to him and the partnership in equal shares. Moreover, the partnership return for 1942 discloses cattle sales in the amount of $37,660.55. The evidence discloses that the amount represents the following purported sales: 90 head belonging to Jack and
Walter
$11,510.60
90 head credited to partnership
December 14, 1942
11,642.25 [1]
65 head credited to partnership
December 31, 1942
8,346.00 [2]
Credited to partnership Decem-
ber 31, 1942
6,161.70
Total
$37,660.55
*224 The amount of $11,642.25, according to the deposit slip bearing the date of December 14, 1942, was for 90 steers out of a lot of 150 sold for $19,403.85. The remaining selling price, amount $7,761.60 for 60 head, was credited to the checking account of Jack and Walter, one-half to each. The deposit was made by the petitioner. He testified that "I wanted Walter and Jack to get their credit out of that and I also wanted particularly to be reimbursed for the cost of these cattle." The substance of the transaction is that Jack and Walter received, without tax, the proceeds of sale of cattle and without paying the cost thereof to petitioner. The manner of handling the matter discloses that little regard was shown for actual ownership of cattle. This is also shown by other evidence. Against the sales of $37,660.55 reported by the partnership, cost of $16,361.70 was deducted. The cost appears to have been based upon a closing inventory of $36,387.86, *225 as that amount was used as an opening inventory in 1943. With an unexplained difference of about $600, it appears to have been computed as follows: On hand January 1, 1942
$10,000.00
Purchases 1942: September 21
$20,000.00
September 23
70.00
December 31
22,069.56
42,139.56
$52,139.56
Inventory close 1942
36,387.86
Cost
$15,751.70
It is evident that no part of the cost of the cattle belonging to Jack and Walter, the proceeds of sale of which were returned by the partnership, is included in the cost of cattle sold and credited to the partnership's account. Eliminating from the sales, as reported by the partnership, the amount of $11,510.60 for the 90 head of cattle belonging to Jack and Walter and one-half of the items in the amounts of $11,642.25 and $8,346, a total of $21,504.72, the result is a loss of $205.97, instead of, as reported, gain of $21,298.95. No contention is made that cattle operations in 1942 were conducted at a loss. Again on February 13, 1943, there was a credit to the bank account of the partnership in the amount of $14,995.40 for sales of cattle. No division was made of the amount for the account of petitioner in *226 accordance with the general instructions given to Moore, who testified that he did not know how the profit from the sale could be determined from the books and that he was not the bookkeeper "from a profit and loss standpoint." The record discloses great indifference to actualities. The treatment of the three checks, for $14,995.40, $8,346 and $11,642.25, totaling about $34,983.65, reported by the partnership and which admittedly should not have been divided, or reported by the partnership in full, is by the petitioner called erroneous. The respondent's view is that "through luck" he was able to trace such items, and that they indicate arbitrary allocation between the two accounts, of petitioner and partnership, and lack of concern on petitioner's part as to book work between the two accounts. We agree. In addition, equal inventories on returns by petitioner and partnership at the end of each of the years 1943 and 1944, indicate, at least in the absence of explanation and in the presence of the fact of great difference in cattle purchases and sales by petitioner and partnership, arbitrary handling of figures and disregard of the facts. In the Culbertson case, supra, the taxpayer *227 laid emphasis upon the fact that the cattle were a breeding herd, that it required time to develop such a herd, therefore father-son partnership was necessary or logical. It is, therefore, pertinent to note that here the petitioner disposed of his breeding stock and that the cattle were "plain" cattle, easier to handle, under the testimony. Moreover, so far as concerns cattle operations, (other than the initial $10,000 purchase) tax consciousness by the petitioner was not absent; for he testified that he was tax conscious when he filed his return for 1941 which was early in 1942. This is after the agreement made in 1941 for farming, but it is prior to the purchase of the second installment of cattle for $20,000, and prior to the setting up of records indicating separation of finances and bank accounts between petitioner and the children. Considering the fact that the agreement in July 1941 concerned farming only, except that the children should have wheat pasture for 250 cattle, and the further fact that somewhat the larger share of net income reported by H. B. Hart & Company in the taxable years appears from cattle, which were not in the partnership contract, such tax consciousness *228 is of significance here. It precedes all partnership cattle operations except the $10,000 purchase. Another aspect of this matter is highly troublesome: On the petitioner's theory the children were interested only in the home cattle. The petitioner himself was in the cattle business in amounts greater than those involved in the alleged partnership - as the petitioner's personal returns show. Bank deposits involved in his personal cattle matters went through the same bank as did the alleged partnership funds. On the record before us we are by no means convinced that the "partnership" deposits did not include monies, perhaps in large amounts, from the petitioner's personal cattle deals. No witness or evidence distinctly, carefully, or satisfactorily separated the deposits as between petitioner's cattle transactions and those of the children. It is true that the petitioner testified that whoever took in drafts or checks into the bank informed Moore in this regard, but the little evidence on the point loses weight when compared with that of Moore, for he testified that he did not think or believe that petitioner had separate cattle operations in 1942, 1943 and 1944 after September 1942 *229 - believed that he had none. He also testified that, in the absence of instructions to the contrary, he took it that the cattle were partnership cattle. He stated also that others, besides himself, took deposits on these matters, such as Mr. Gibner and the tellers. Instructions to them or their understanding as to how to divide deposits, the record does not disclose. Generally, and where not definitely told otherwise, they divided deposits equally. Some checks represented by deposit slips came directly to the bank for deposit. Moore could not recall any specific statement or instance where the petitioner told him that the deposits were not to be divided evenly. It is thus apparent that Moore generally, if not always, assumed that deposits were to be split, and thus that petitioner's money may have found its way into the "partnership" account. We know that out of the first five credits errors were made in four, the effect of which was to overstate sales by the partnership in the amount of $36,500.12. The deposit of $14,995.40 on February 13, 1943, was not split but was all credited to the partnership, when, in fact, it all belonged to the petitioner. Under all of these circumstances *230 we can only conclude that even if we should assume that there was a partnership in cattle, on the record there is still (aside from the $10,000 and $20,000 cattle purchases) a failure of proof as to whether or to what extent the monies found in the deposits to the partnership account represent the individually earned income of the petitioner. Having concluded that there was no partnership agreement as to cattle, we next inquire as to the realities in that respect. The evidence is very strongly to the effect that petitioner was well known as a capable buyer and seller of cattle, and that he bought and sold all of those here involved. Not one purchase or sale transaction appears in the name of the partnership. Further, the evidence is to the effect that profit in cattle depends upon wise buying at the right time and selling when the market is right. It is not even argued that any of the children had the knowledge or experience necessary to success in dealing in cattle. The children were, in fact, in large part not present or available to make contribution of either ability or services as to the cattle business. In effect, Walter, Anna and Jack were absent during the taxable years. *231 As we have concluded that they had no rights, by previous contract, as partners in any cattle business, the fact that Walter and Jack were in the armed services appears here immaterial, for the broad question is: Who earned the profit from cattle? Obviously these three children did not do so, and equally obviously the petitioner did, by the exercise of his abilities as cattle dealer, with some field assistance from Don and Dorothy. The petitioner bought the cattle and paid for them himself. In general, at some later time, which therefore may have been before or after their sale, Moore charged the purchase price to the partnership account, as to one-half - the only part in which we are here interested - and the partnership got the benefit of any profit. Does the reimbursement of petitioner for a one-half of cost, from partnership funds, demonstrate that the partnership or the partners, and not petitioner, earned one-half of the profit? We do not so consider. Clearly it does not show participation in the earning by those children who were absent. The petitioner had complete dominion and control over the earning, the writing of checks, and distribution of profits. In the absence, as we *232 have found, of an agreement of partnership, we find in the children no right to the profits from petitioner's ability and efforts. He controlled the division and distribution through the bank, for Moore testified that he and others in the bank who received deposits divided, as directed by petitioner, or assumed equal division. With the abundant evidence of petitioner's dominion in all these matters, we can not regard the sales proceeds as those of others. His arbitrary charge of $1,225 on December 31, 1942, for "payment at $5.00 per head on 245 cattle for expense of looking after and caring for cattle," because "Walter went into the service and H. B. Hart & Company had not rendered as much service as I expected" shows not only his control but affirmatively demonstrates that he was looking after the cattle, in his opinion, in 1942, and was himself disregarding the alleged earlier "partnership" agreement. In our opinion, the petitioner (except as half interest in the 1,000 cattle), through the medium of the partnership account, distributed his own earnings to the children, and should be taxed thereon. His mere use, in reimbursing himself, of the partnership bank account does not cause *233 the children to earn profits. Petitioner did not even buy with their money; and the evidence shows no authority from them to reimburse himself for half of cost. The most that appears in that regard seems to be, on their part, the "passive acquiescence to the will of the donor" as expressed by the Culbertson case. In the absence of an agreement that petitioner should purchase cattle, as partner or coadventurer or agent, or under other contractual arrangement, for the children, they acquired no property right in the cattle by the mere fact of charge by him of half of cost to their bank account. We find no such agreement and we find them not earning the income from cattle profits. They were neither able to do so, nor, except in minor part as to Dorothy and Don, present to do so. To permit Anna, living from June 1942 in Montana, Walter, absent from even earlier, or Jack, also absent almost all of the taxable years and contributing practically nothing to cattle operations, to share in the profits made by their father would, under all of the attendant circumstances here found, be altogether unrealistic. The situation as to Don, and to some extent, Dorothy, is not quite the same. They were *234 not so completely absent as the others, and contributed something to cattle operations when not in school, or college, or teaching. But they were, under the above recognized farming partnership agreement of 1941, to perform service for petitioner as before, and he expected thereby to secure the bulk of their services; and we are unable to see in the very limited time they were able to devote, and did under the evidence devote, to the cattle any reasonable basis for calling the cattle profits theirs. They did not buy or sell nor furnish the capital to buy nor authorize charge thereof against their account. He was in control of that account, signing checks thereon to himself as he saw fit. We see no error in ascribing cattle profits to the petitioner. Clearer dominion and control could hardly be shown. The petitioner, as to Don, for 1944 has been, in the determination of deficiency, allowed deduction of expense of $2,000, as has already been seen. We are, in substance, as to cattle operations, only, sustaining the respondent's contention in connection with which he allowed the $2,000 as deduction of expense. The evidence fails to indicate what amount of Don's services were devoted *235 to farming, or to cattle. Therefore, under the rule of , we approve a deduction of $1,000 as one-half of the $2,000, for expenses of petitioner's cattle operation. This is not making a new contract, but only recognizing the fact of services rendered by, and payments made to Don, under the respondent's theory, as sustained. In this conclusion, however, we do not include profits from the sale of the $10,000 cattle purchase on January 3, 1942, or the $20,000 purchase on September 20, 1942. These cattle are shown to have been acquired by the children (though not as a partnership), from their earnings, though petitioner had financed their earlier operations. We, therefore, consider that they owned these cattle, as distinguished from later cattle purchased by the petitioner. Under the evidence, as already set forth, of the cattle sales in the amount of $37,660.55 reported by the partnership in 1942, with cost of $16,361.70, only $16,155.83 were of cattle in which the children had an interest, and all of them, with the minor exception of two steers, for which the partnership bank account was $70charged, were out of the 500 head purchased *236 from petitioner in 1941 at a cost of $40 a head and in 1942 at a cost of $80 a head. In the absence of proof of whether the sales were out of the 1941 or 1942 purchases and the number of cattle sold in each sale, we apply the doctrine of , to compute the gain. First we treat the children's one-half interest in the common herd of cattle as having a cost of $30 a head, an amount equal to the average cost. The sale of 90 cattle for $11,642.25 was at the rate of $129.36 a head. The sale of 65 head for $8,346 was at the rate of $128.40 a head. We will regard 48 cattle as having been sold at the rate of $128 a head, or for $6,161.70. The remainder of the $30,000 purchases by the partnership were disposed of in 1943, for attached to petitioner's worksheet copy of his return for that year is his cattle inventory at the end of 1943 (which is there divided equally between him and the partnership) reciting that the cattle were "purchased in 1942 or 1943," so could not have included any of the $30,000 purchases, which were from the 1,000 cattle purchased in 1941. A short time before or after the acquisition by petitioner in the fall of 1941 of the herd *237 of 1,000 cattle, 90 of them were placed with 60 other cattle Jack and Walter owned jointly in their individual capacity. The acquisition increased the number of cattle in their herd to 150. Jack testified that he "cut" them out of the herd of 1,000 head. It does not appear whether they were charged or ever paid for the cattle. The partnership return for 1941 does not disclose the sale of any cattle belonging to it. All or a part of the 90 head might be included in the sale made in 1942 for $11,510.60, the proceeds of which were erroneously credited to the partnership's cattle sales for that year. Under the circumstances, we will regard the herd of 1,000 cattle as having been reduced by 90 head for recovery of cost and sales purposes in 1943. The adjustments leave a cost of $21,210 for recovery in 1943 out of the sale of the remaining 707 head of cattle, which under the Cohan rule and for lack of other evidence we will regard as having been sold for $128 a head, which was the selling price for the last lot sold in 1942. These figures are tentative, to be reduced on Rule 50 computation by expenses, other than cost, chargeable against the $30,000 cattle. Expenses of "plowing, drilling *238 and combining" listed in each year should be eliminated as not against cattle, while expense of "feed and pasture" are against cattle only. Other expenses should be apportioned to cattle in the proportion cattle sales bear to grain sales. The final question is whether the petitioner was properly disallowed deduction for $3,200 interest paid. Under the evidence, it was "back interest" incurred prior to a settlement about 1935, for $10,000, of a debt made in 1930 for two-thirds of about $25,600, bearing 6 per cent interest. No showing is made as to whether any interest was paid between 1930 and 1935, therefore, it does not appear whether $3,200 interest was then due and owing. The amount of interest then unpaid is never stated in the record. Only $10,000 was paid on the principal. Much interest may have been paid before 1935. We may not presume otherwise. If less than $3,200 was owing on "back interest" in 1935, at the time of settlement, the payment would be, in some degree, in the nature of a gift or voluntary payment. The contrary is not shown. In fact, petitioner testified, apparently referring to the payment of the $3,200, "Well, he [the payee Laird] did not have his figures *239 with him. I paid some interest and we called it square." This indicates that even the petitioner does not know whether the payment was all interest or not. It was a payment, but the nature thereof does not affirmatively appear here. On the showing made, not knowing whether $3,200 back interest was due (and aside from the question of indebtedness or obligation) we can not say that the Commissioner erred in disallowing the deduction. Decision will be entered under Rule 50. Footnotes
*. Haden B. Hart, Docket Nos. 16571, 19087. Rhoda Hart, Docket Nos. 16572, 19088.↩
1. The amount should have been divided equally between petitioner and the partnership. ↩
2. The deposit slip shows that petitioner's check was deposited. The amount should have been divided equally between petitioner and the partnership.↩